**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**NORTH DIVISION**

| | |
|---|---|
| AMARION HARRIS, | Case No. 2:23-cv-01673 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| EQUIFAX INFORMATION SERVICES, LLC. and TRANS UNION LLC | |
| Defendants. | |

## COMPLAINT

Amarion Harris ("Plaintiff" or "Mr. Harris") brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax") and Trans Union LLC ("Trans Union"), (collectively, "Defendants") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, et. seq., arising out of Defendants' mixing Plaintiff's credit file with another consumer.

### INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, this information has unfortunately also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7. Congress made the following findings when it enacted the FCRA in 1970:

(a)     The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)     An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)     Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)     There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a) (1-4).

8.      Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."  15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW*, Inc., 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 Cong. Rec. 36570 (1970)).

10. Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13. The FCRA also requires furnishers of information, a creditor or other third party that provides information about a consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14. A recurring and known issue within the credit reporting industry is the creation of "mixed files."

15.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.     "Mixed files" create a false description and representation of a consumer's credit history.

17.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW*, Inc., 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.     Mixed files are not a new phenomenon. Defendants have been on notice of the existence of mixed files, and the fact that their procedures for creating credit files, including their matching algorithms, are all prone to frequently cause mixed files, for over thirty (30) years. *See, Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.     More recently, Defendants have been the subject of numerous state attorney general actions relating to their respective mixed file problems.

20.     For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant over mixed files.[1]  *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc*.; *Equifax Information Services, LLC*; and *Trans Union LLC*.

---

[1] *A.G. Schneiderman Announces Groundbreaking Consumer Protection Settlement With The Three National Credit Reporting Agencies*, N.Y. Atty. Gen., https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three (Mar. 9, 2015) (last visited Nov. 27, 2023); see also https://nylawyer.nylj.com/adgifs/decisions15/031015settlement.pdf (last visited Nov. 27, 2023).

21.     Notwithstanding Defendants' notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other.

23.     Defendants have been sued thousands of times wherein an allegation was made that Defendants violated the FCRA.  Moreover, Defendants are sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendant mixed a consumer's credit file with that of another consumer.

24.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC, District of Oregon*, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes.  The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

26.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the

FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

27.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

28.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See, Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), aff'd in part, vacated in part, rev'd in part sub nom. *Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

29.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco*

*Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.     Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Experian, to review their procedures when a mixed file occurs.

32.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.     Plaintiff's claims arise out of Defendants' blatantly inaccurate credit reporting, wherein Defendants published in a consumer report about Plaintiff the information of another consumer because Defendant mixed Plaintiff's credit file with that of another consumer.

34.     Further, Plaintiff's claims also arise out of Defendants blatantly inaccurate credit reporting, wherein Defendant permitted the impermissible access to Plaintiff's credit file when it published a consumer report about Plaintiff in response to a credit application submitted by and pertaining to another consumer because Defendant mixed Plaintiff's credit file with that of another consumer.

35.     Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

36.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., as described herein.

## PARTIES

37.     Amarion Harris ("Plaintiff" or "Mr. Harris") is a natural person residing in Greenfield, Wisconsin, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

38.     Defendant Equifax Information Services, LLC. ("Equifax") is a corporation with a principal place of business located at 1550 Peachtree Street NW, Atlanta, GA 30309, and is authorized to do business in the State of Wisconsin, including within this District.

39.     Defendant Trans Union LLC ("Trans Union") is a corporation with a principal of business located at 555 West Adams Street, Chicago IL 60661and is authorized to do business in the State of Wisconsin, including within this District.

40.     Each Defendant is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Defendants regularly engage in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

41.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

42.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

43.     The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

44.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. See 15 U.S.C. § 1681(a).

45.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer regarding the confidentiality, accuracy, relevancy, and proper utilization of such information. See 15 U.S.C. § 1681(b).

46.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

47.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## Defendants' Processing of Credit Information

48.     Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

49.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

50.     Defendants collect information from thousands of furnishers.

51.     The process by which Defendants receive, sort, and store information is largely electronic.

52.     Furnishers report credit information to Defendants using coded tapes that are transmitted to Defendants on a monthly through software known as Metro 2.

53.     Defendants take credit information reported by furnishers and create consumer credit files.

54.     Defendants maintain credit files on more than 200 million consumers.

55.     Credit files are updated electronically by the furnishers to reflect added information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

## Defendants' Mixed File Problem

56.     Defendants know that different consumers have similar names.

57.     Defendants know that different consumers can have similar Social Security numbers.

58.     Defendants know that different consumers with similar names can also have similar Social Security numbers.

59.     Defendants know that public records often contain identifying information such as Social Security numbers or dates of birth.

60.     Defendants match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

61.     Defendants accomplish this matching of credit information to consumer credit files using certain matching algorithms or database rules.

62.     From time to time, Defendants' matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the credit reporting industry as a mixed or merged credit file.

63.     Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered individual Consent Decrees with each of the major CRAs, specifically including Defendants, regarding its significant failures and deficiencies with respect to mixed files.

64.     Despite Defendants' long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendants containing information belonging to another consumer.

65.     A mixed or merged credit file is the result of Defendants' inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

66.     There are many different potential causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendants to match personal identifying information and credit information, including public record information, to a particular consumer's credit file.

67.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendants.

68.     A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendants.

69.     Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

70.     Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

**Plaintiff Applies for a Credit Card with Educators Credit Union**

71.     In June 2022, Plaintiff was interested in securing a credit card in order to have the credit he needed to support his family.

72.     On or about June 8, 2022, Plaintiff completed and submitted a credit card application with Educators Credit Union.

73.     For Educators Credit Union to make a determination on Plaintiff's credit card application, it would need to obtain copies of his credit files. Plaintiff provided Educators Credit

- 13 -

Union with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

74.     On June 8, 2022, Trans Union sold a credit report about Plaintiff to Educators Credit Union in response to Plaintiff's credit application.

**Educators Credit Union Decisions Plaintiff's Credit Card Application**

75.     Upon information and belief, the credit report Trans Union sold to Educators Credit Union about Plaintiff included consumer information that did not belong to him.

76.     Upon information and belief, the inaccurate information on Plaintiff's credit report negatively impacted the terms that Plaintiff was approved for.

77.     It is inaccurate for Trans Union to publish information to a third party that included consumer information that does not belong to Plaintiff.

78.     Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published to Educators Credit Union and maintained concerning Plaintiff.

**Plaintiff Applies for an Auto Loan at Lake Ford Car Dealership**

79.     In or around June 2022, Plaintiff decided to purchase a new vehicle in order to better support his needs as a father.

80.     On or about June 15, 2022, Plaintiff visited a car dealership and found a car that suited his needs.

81.     On or about June 15, 2022, Plaintiff completed and submitted an auto loan application through Lake Ford Car Dealership ("Lake Ford").

82.     Upon information and belief, Lake Ford submitted Plaintiff's credit application through multiple financers, including but not limited to: (1) Capital One Auto Finance; (2)

Summit Credit Union; (3) Landmark Credit Union; (4) Financial Institution Lending Options; (5) Wells Fargo Dealer Services; (6) US Bank N. Central; (7) BMO Harris Bank, N.A.; (8) Ally Financial; (9) AmeriCredit; and (10) JPMorgan Chase Bank Auto Finance.

83.     For the auto financers to make a determination on Plaintiff's auto loan application, they would need to obtain copies of his credit files. Plaintiff provided his personal identification information, including his Social Security number, to Lake Ford who in turn provided it to the auto financers. Plaintiff also authorized the auto financers to obtain copies of his credit files.

84.     On June 15, 2022, Trans Union sold a credit report about Plaintiff to one or more auto financers, including but not limited to: (1) Capital One Auto Finance; (2) Summit Credit Union; (3) Landmark Credit Union; (4) Financial Institution Lending Options; (5) Wells Fargo Dealer Services; (6) US Bank N. Central; (7) BMO Harris Bank, N.A.; (8) Ally Financial; (9) AmeriCredit; and (10) JPMorgan Chase Bank Auto Finance, in response to Plaintiff's auto loan application.

85.     On June 15, 2022, Equifax sold a credit report about Plaintiff to at least one auto financer, including but not limited to: Capital One Auto, in response to Plaintiff's auto loan application.

**The Auto Financers Decision Plaintiff's Auto Loan Application**

86.     Upon information and belief, the credit reports Trans Union and Equifax sold to the aforementioned auto financers about Plaintiff included consumer information that did not belong to him.

87.     Upon information and belief, the inaccurate information on Plaintiff's Trans Union and Equifax credit reports contributed to one or more of the auto financer's decision(s) to deny Plaintiff's auto loan application.

88.     Upon information and belief, the inaccurate information on Plaintiff's Trans Union credit report negatively impacted the terms Plaintiff was approved for through Ally Financial.

89.     It is inaccurate for Trans Union to publish information to a third party that included consumer information that does not belong to Plaintiff.

90.     It is inaccurate for Equifax to publish information to a third party that included consumer information that does not belong to Plaintiff.

91.     Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

92.     Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff's Mixed Credit File as of June 2022**

93.     Although approved for the Educators Credit Union credit card and Ally Financial auto loan, Plaintiff was shocked and dismayed by the terms he was offered; Plaintiff believed his credit should have qualified him for better terms than he received.

94.     Plaintiff was also shocked and dismayed by the number of auto financers that denied his auto loan application.

95.     Accordingly, Plaintiff immediately reviewed his credit reports.

96.     On or about June 15, 2022, Plaintiff secured a copy of his Trans Union credit file.

97.     Upon reviewing the contents of the June 15, 2022 Trans Union credit file, Plaintiff was shocked and confused by the appearance of several pieces of information that did not belong to Plaintiff at all.

- 16 -

98.     Specifically, Trans Union was reporting the following accounts which did not belong to Plaintiff:

  (a) EdFinancial
    Date Opened: December 6, 2021
    Balance: $4,000

  (b) EdFinancial
    Date Opened: November 24, 2021
    Balance: $2,000

  (c) EdFinancial
    Date Opened: November 24, 2021
    Balance: $3,500

99.     Further, Trans Union was reporting the following name which did not belong to Plaintiff:

  (a) Amariana Harris

100.     By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Trans Union failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

101.     On or about June 15, 2022, Plaintiff secured a copy of his Equifax credit file.

102.     Upon reviewing the contents of the June 15, 2022 Equifax credit file, Plaintiff was shocked and confused by the appearance of several pieces of information that did not belong to Plaintiff at all.

103.     Specifically, Equifax was reporting the following accounts which did not belong to Plaintiff:

  (a) EdFinancial
    Date Opened: December 6, 2021

- 17 -

Balance: $4,000

    (b)    EdFinancial
                Date Opened: November 24, 2021
                Balance: $2,000

    (c)    EdFinancial
                Date Opened: November 24, 2021
                Balance: $3,500

104. Further, Trans Union was reporting the following address which did not belong to Plaintiff:

    (b)    \*\*\*\* N. Cambridge Ave., Milwaukee, WI 53211

105. By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Equifax failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**106.** **Plaintiff's June 2022 Dispute to Trans Union**

107. On or before June 15, 2022, worried that something was very wrong with his credit file, Plaintiff disputed the inaccuracies with Trans Union. Specifically, Plaintiff disputed the information that did not belong to him.

108. Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his report.

109. On or before June 16, 2022, Trans Union updated Plaintiff's report to remove the inaccurate name variation and the three disputed Ed Financial accounts.

**Plaintiff's June 2022 Dispute to Equifax**

110. On or before June 17, 2022, worried that something was very wrong with his credit file, Plaintiff disputed the inaccuracies with Equifax. Specifically, Plaintiff disputed the information that did not belong to him.

111. Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his report.

112. On or before August 2, 2022, Equifax updated Plaintiff's report to remove the three disputed Ed Financial accounts.

113. Equifax did not, however, removed the disputed address.

114. At the time, Plaintiff believed the mixed file issue had been resolved. However, Equifax added additional inaccurate information to Plaintiff's credit file that did not belong to him thereafter.

**Plaintiff Applies For Mortgage Pre-Approval With Total Mortgage**

115. In or around September 2023, Plaintiff decided to begin the home-buying process.

116. Plaintiff hoped to purchase a home so that his child could have room to grow and play.

117. On or about September 21, 2023, Plaintiff completed and submitted an application for mortgage pre-approval with Total Mortgage.

118. For Total Mortgage to make a determination on Plaintiff's mortgage pre-approval application, it would need to obtain copies of his credit files. Plaintiff provided Total Mortgage with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

- 19 -

119.     On September 21, 2023, Equifax sold a credit report about Plaintiff to Total Mortgage in response to Plaintiff's credit application for mortgage pre-approval.

**120.     Total Mortgage Denies Plaintiff's Application for Mortgage Pre-Approval**

121.     In or around September 2023, a Total Mortgage representative called Plaintiff and informed him that his pre-approval application was denied.

122.     Specifically, the Total Mortgage representative informed Plaintiff that he did not qualify due to his low credit score.

123.     Once again, Plaintiff was baffled and confused because he believed he had good credit.

124.     Upon information and belief, the credit report Equifax sold to Total Mortgage about Plaintiff included consumer information that did not belong to him.

125.     Upon information and belief, the inaccurate information on Plaintiff's credit report negatively impacted Plaintiff's credit application.

126.     It is inaccurate for Equifax to publish information to a third party that included consumer information that does not belong to Plaintiff.

127.     Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

### Plaintiff's Mixed Credit File as of September 2023

128.     Between June 2022 and September 2023, Equifax reported additional inaccurate information to Plaintiff's credit file that did not belong to him.

129.     Upon information and belief, beginning in or around June 2022, Equifax reported a second inaccurate address that did not belong to Plaintiff: **** N. 36th Street, Milwaukee, WI 53209.

130.     Upon information and belief, between June 2022 and September 2023, Equifax began reporting the following accounts that did not belong to Plaintiff:

      (a)     Atlantic Capital Bank
            Date Opened: June 30, 2022

      (b)     Summit Credit Union
            Date Opened: August 5, 2022
            High Balance: $11,710

      (c)     Atlantic Capital Bank
            Date Opened: November 4, 2022

      (d)     Self/SouthState Bank
            Date Opened: November 4, 2022

      (e)     EdFinancial
            Balance: $2,000
            Date Opened: February 22, 2023

      (f)     EdFinancial
            Balance: $3,500
            Date Opened: February 22, 2023

131.     Additionally, Equifax reported a Social Security number variation, ending in 5148 that does not belong to Plaintiff.

132.     By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Equifax failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

133.     Further, Equifax also reported the following account inquiries, with whom Plaintiff did not have an account relationship:

        (a)     Exeter Finance, July 8, 2022; and

        (b)     Global Lending Services, July 8, 2022.

134.     Plaintiff did not apply for credit with any of the aforementioned entities and did not have a relationship with any of the aforementioned entities. Equifax did not have a permissible purpose for furnishing information about Plaintiff to the above-referenced entities on the above-referenced dates.

135.     Upon information and belief, both of the above-referenced inquiries were initiated by credit applications submitted by another consumer.

136.     As Plaintiff had not authorized any of the above-referenced entities to request Plaintiff's credit report from Equifax on the above-referenced dates in 2022, nor did Plaintiff enter into any business transaction or relationship which otherwise may have provided a basis for those entities securing a copy of Plaintiff's credit report from Equifax, Equifax disclosed information about Plaintiff to the above-referenced entities without a permissible purpose and in violation of 15 U.S.C. § 1681b(a).

137.     Upon information and belief, Equifax disclosed information about Plaintiff to one or more other entities without a permissible purpose and in violation of 15 U.S.C. § 1681b(a) as well.

**Plaintiff's September 2023 Dispute to Equifax**

138.     On or before September 24, 2023, worried that something was now very wrong with his Equifax credit file, Plaintiff disputed the inaccuracies with Equifax by phone. Specifically, Plaintiff disputed the information that did not belong to him.

139.    Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

**The Credit Bureaus' Method for Considering Consumer Credit Report Disputes**

140.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

141.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

142.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

143.    It is also known industry-wide as the CDIA's "Credit Reporting Resource Guide."

144.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

145.    Metro 2 codes are used on an industry-wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

146.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and credit reporting agencies.

147. These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

148. Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

149. The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

150. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Equifax's Unreasonable Dispute Reinvestigation**

151. On or about October 6, 2023, Plaintiff received a dispute response from Equifax.

152. Equifax stated that it had investigated Plaintiff's dispute and verified that the disputed EdFinancial accounts belong to Plaintiff and therefore would remain on Plaintiff's report.

153. Equifax also did not remove the inaccurate addresses after receiving Plaintiff's September 2023 dispute.

154. Additionally, Equifax did not remove the inaccurate inquiries from Exeter Finance or Global Lending Services after receiving Plaintiff's September 2023 dispute.

155.    However, Equifax did remove the Summit Credit Union and Self/SouthState Bank accounts.

156.    In or around late October or early November 2023, Plaintiff received an envelope from Equifax that contained two dispute responses each dated October 21, 2023. Both dispute responses once again indicated that Equifax verified the accuracy of the disputed EdFinancial accounts.

157.    A few days later, Plaintiff received a second envelope from Equifax with two more dispute responses each dated October 21, 2023. Both dispute responses indicated that Equifax verified the accuracy of the disputed EdFinancial accounts.

158.    It is unclear why Equifax sent Plaintiff four additional dispute responses dated October 21, 2023 indicating that it had verified the disputed EdFinancial accounts as belonging to him.

159.    Upon information and belief, Plaintiff had previously initiated one or more other disputes with Equifax.

160.    Upon information and belief, Equifax removed the inaccurate Atlantic Capital Bank accounts in response to one or more of Plaintiff's prior disputes.

161.    Upon information and belief, Equifax did not remove the inaccurate addresses after receiving one or more of Plaintiff's prior disputes.

162.    Upon information and belief, Equifax did not remove the inaccurate inquiries after receiving one or more of Plaintiff's prior disputes.

163.    Equifax failed to conduct a reasonable investigation of at least one of Plaintiff's disputes, or any reinvestigation whatsoever, to determine whether the disputed information was

- 25 -

inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

164.    Thereafter, and upon information and belief, Equifax failed to unmix Plaintiff's credit file from that of the other consumer and likely Equifax continued to report the other consumer's information to Plaintiff's credit file.

165.    As a standard practice, Equifax does not conduct independent investigations in response to consumer disputes.  Instead, it merely parrots the response of the credit furnisher(s), despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute.");  *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

166.    Upon information and belief, because Equifax continues to mix Plaintiff's credit file with that of the other consumer, Equifax continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to the other consumer.

167.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit

applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; loss of sleep; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

**Plaintiff Applies For Mortgage Pre-Approval With Educators Credit Union**

168.     Desperate to secure a mortgage and purchase a home for his growing family to live in, Plaintiff decided to apply for pre-approval with a different lender.

169.     Plaintiff decided to apply with Educators Credit Union since he had an existing relationship with them.

170.     On or about October 12, 2023, Plaintiff completed and submitted a mortgage pre-approval application with Educators Credit Union.

171.     For Educators Credit Union to make a determination on Plaintiff's credit application, it would need to obtain copies of his credit files. Plaintiff provided Educators Credit Union with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

172.     On October 12, 2023, Equifax sold a credit report about Plaintiff to Educators Credit Union (through Informative Research) in response to Plaintiff's application for mortgage pre-approval.

**Educators Credit Union Decisions Plaintiff's Application for Mortgage Pre-Approval**

173.     In or around October 2023, Educators Credit Union informed Plaintiff that it could not approve him for the loan amount he desired ($200,000).

174.    Instead, Educators Credit Union pre-approved Plaintiff for up to $90,000.

175.    The pre-approval amount was not enough for Plaintiff to purchase the home he desired; Plaintiff felt hopeless.

176.    Upon information and belief, the credit report Equifax sold to Educators Credit Union about Plaintiff included consumer information that did not belong to him.

177.    Upon information and belief, the inaccurate information on Plaintiff's credit report negatively impacted Plaintiff's credit application.

178.    It is inaccurate for Equifax to publish information to a third party that included consumer information that does not belong to Plaintiff.

179.    Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published to Educators Credit Union and maintained concerning Plaintiff.

180.    Equifax and Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information they published and maintained concerning Plaintiff.

181.    Equifax and Trans Union are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, Defendants' violations of the FCRA are willful.

182.    As a result of the "mixed file," Equifax and Trans Union made it practically impossible for Plaintiff to obtain credit, or credit on favorable terms.

183.    At all times pertinent hereto, Equifax and Trans Union were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their

agency or employment, and under the direct supervision and control of Equifax and Trans Union respectively.

184.    At all times pertinent hereto, Equifax's and Trans Union's conduct, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

185.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; loss of sleep; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

186.    More specifically, Defendants' inaccurate reporting caused Plaintiff to feel as though he could not provide for his family.

187.    Plaintiff indefinitely postponed his dream of owning a home and has refrained from applying for any kind of credit out of sheer fear the inaccurate reporting will be published to other prospective creditors and cause additional harm.

188.    Plaintiff is also distracted while working and suffers from sleepless nights as the inaccurate reporting is constantly on Plaintiff's mind.

189. Further, the inaccurate reporting has caused tension between Plaintiff, and the individual Plaintiff believes Defendants mixed him with, his own sister.

## CLAIMS FOR RELIEF
## COUNT I
## 15 U.S.C. § 1681e(b)
## Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendants Equifax and Trans Union)

190. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

191. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

192. On at least one occasion, Defendants prepared patently false consumer reports concerning Plaintiff.

193. Defendants mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and Plaintiff's creditworthiness.

194. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to

correct the inaccurate credit reporting; loss of sleep; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

195.    Defendants' conduct, actions, and inaction were willful, rendering them individually liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

196.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendant Equifax)

197.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

198.    Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure the maximum possible accuracy of the information concerning the individual to whom the report relates.

199.    The FCRA mandates that CRAs like Defendant Equifax conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id*.

200.    The FCRA provides that if a CRA like Defendant Equifax conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file. *See,* 15 U.S.C. § 1681i(a)(5)(A).

201.    On at least one occasion, Plaintiff initiated a dispute with Defendant Equifax and disputed inaccurate information reporting in his credit file and requested that Defendant Equifax correct and/or delete the inaccurate, misleading, and damaging information belonging to another consumer.

202.    Defendant Equifax failed to reasonably reinvestigate no less than one of Plaintiff's disputes or failed to conduct any investigation whatsoever, or such investigation, if any, was so unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

203.    Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

204.    As a result of Equifax's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his

good credit rating; detriment to his credit rating; the expenditure of time disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; loss of sleep; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

205.     Equifax's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Equifax was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

206.     Plaintiff is entitled to recover attorneys' fees and costs from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### 15 U.S.C. § 1681b(a)
### Furnishing a Credit Report Without a Permissible Purpose
### (Third Claim for Relief Against Equifax)

207.     Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

208.     This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the dissemination of consumer credit and other financial information.

209.     Plaintiff is a "consumer" as defined by the FCRA.

210.     Equifax is a "consumer reporting agency" that furnishes consumer reports as defined and contemplated by the FCRA.

211.     The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

212.     On at least two occasions, Equifax furnished Plaintiff's credit report to various entities without a permissible purpose in response to credit applications of another, which did not involve Plaintiff, and which Equifax therefore had no reason to believe that those various credit-issuing entities intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

213.     Equifax violated 15 U.S.C. § 1681b(a) by selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of another consumer.

214.     As a result of Equifax's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; loss of sleep; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

215.     Equifax's conduct, actions, and inactions, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Equifax was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

216.     Plaintiff is entitled to recover attorneys' fees and costs from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.      Determining that Defendant negligently and/or willfully violated the FCRA;

ii.     Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.     Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

Dated: December 13, 2023

**CONSUMER ATTORNEYS**
By: */s/McKenzie Czabaj*
McKenzie Czabaj, AZ Bar #036711
CONSUMER ATTORNEYS
8245 N. 85th Way
Scottsdale, AZ 85258
T: 480-626-2376
E: Mczabaj@consumerattorneys.com

*Attorneys for Plaintiff*
*Amarion Harris*